IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**KANSYS STAFFING GROUP, LLC,**

    **Plaintiff,**

v.

**QRAILS, INC., et al.,**

    **Defendants.**

Case No. 24-2176-DDC-TJJ

**MEMORANDUM AND ORDER**

Plaintiff Kansys Staffing Group, LLC has sued defendants QRails, Inc. and XTM, Inc., alleging a number of contract and tort claims. All the claims stem from a staffing agreement signed by Kansys Staffing and QRails. Kansys Staffing appears to have served both defendants properly. But due to some sort of disconnect, XTM failed to plead or otherwise defend in time. So, the Clerk of the Court entered a default against XTM. XTM now has filed a Motion to Set Aside Clerk's Entry of Default (Doc. 15). And in any event, defendants argue, the federal forum isn't appropriate at this stage. That's so, defendants assert, because Kansys Staffing agreed to arbitrate these claims. So QRails filed a Motion to Compel Arbitration (Doc. 14), which XTM joins if the court sets aside its default.

The court takes up both motions, below. As it explains, the court grants the Motion to Set Aside (Doc. 15) and grants in part and denies in part the Motion to Compel Arbitration (Doc. 14). But first, a brief factual background.

**I.     Background**

On July 19, 2023, Kansys Staffing and QRails entered a staffing agreement. Doc. 1 at 2

(Compl. ¶ 7); Doc. 14 at 2.  XTM isn't a party to this agreement.[1]  *See* Doc. 1-1 (Pl. Ex. A); Doc. 15-1 at 3 (Lester Decl. ¶ 6).  Kansys Staffing alleges that though it upheld one end of the bargain, QRails never upheld the other.  Doc. 1 at 3 (Compl. ¶¶ 10–15).  And, as a result, Kansys Staffing alleges QRails owes it at least $181,490.  *Id.* (Compl. ¶ 15).  According to Kansys Staffing, QRails and XTM each "acknowledged and promised to pay the outstanding debt[.]"  *Id.* (Compl. ¶¶ 16–17).  So, Kansys Staffing asserts breach of contract, account stated, quantum meruit/unjust enrichment, negligent misrepresentation, and fraudulent misrepresentation claims against both defendants.  Doc. 1 at 3–7 (Compl. ¶¶ 18–51).

Kansys Staffing served both QRails and XTM with process.  *See* Doc. 9; Doc. 10.  QRails received service and engaged counsel in a timely fashion.  Doc. 15 at 1.  But XTM asserts that even though plaintiff served its registered agent,[2] XTM never received the papers.  *Id.* at 2–3.  Something went awry after service, it seems.  The summons never made it— physically or electronically—from the registered agent in Wilmington, Delaware, to XTM's general counsel in England.  *See id.* at 2 n.1; 2–3.  And once XTM realized plaintiff had served the company, it promptly engaged in the case.  *Id.* at 7–8.  But it was too late.  XTM's deadline to answer or otherwise defend had come and gone.  *See* Doc. 10 at 1 (service executed May 3, 2024); Fed. R. Civ. P. 12(a)(1) (defendant must answer within 21 of service); Doc. 12 at 1 (noting under the rules that XTM's deadline was May 24, 2024).  So, Kansys Staffing requested, and the Clerk of the Court entered an entry of default against XTM.  *See generally* Doc. 12 (filed

---

[1]   But XTM is QRails's corporate parent by acquisition, according to defendants.  Doc. 15-1 at 3 (Lester Decl. ¶ 5).

[2]   XTM asserts that "owing to confusion over the structure of XTM's business and the nature of XTM's acquisition of QRails, the Complaint reflects a scattershot approach to service of process on four (4) purported registered agents for XTM[.]"  Doc. 15 at 2.  But, they note, one of those "purported registered agents" was indeed the correct registered agent.  *Id.*  That concession nullifies XTM's modifier—"purported"—for the correct registered agent.

June 7, 2024); Doc. 13 (entered June 17, 2024).

But wait, defendants argue, there's more to the story. There's a mandatory arbitration clause in the contract. *See generally* Doc. 14. This arbitration clause reads:

> The parties agree that any dispute between them arising out of this Agreement and the services hereunder shall be resolved by binding arbitration conducted under the Commercial Arbitration Rules of the American Arbitration Association in effect as of the date any such action thereunder is initiated. A single arbitrator will make a determination and render an award within thirty (30) days of the close of evidence in such arbitration proceeding but will have no authority to award costs or punitive damages unless the parties so agree in writing. The parties waive right to jury trial and agree that the arbitration award will be final and binding and that judgment will be entered thereon in any court of competent jurisdiction. Notwithstanding the foregoing, any party may seek immediate judicial intervention to prevent any unauthorized use or disclosure of the confidential or proprietary information of the party (or those to whom it owes a duty of confidentiality) bringing any such action.

Doc. 1-1 at 6 (Pl. Ex. A).

With this background, the court now analyzes both motions. The court starts with the question whether to set aside XTM's default. The analysis concludes by deciding whether the parties must arbitrate these claims.

## II.    Motion to Set Aside Entry of Default (Doc. 15)

Defendant XTM, Inc. currently is in default. Doc. 13 (Clerk's Entry of Default). But XTM asks the court to set aside that default because of the service issue. Doc. 15 at 1–5. Kansys Staffing never responded to this motion. So, the court treats the motion as unopposed.

Under Federal Rule of Civil Procedure 55(c), the court needs "good cause" to set aside an entry of default. Fed. R. Civ. P. 55(c). This standard is a "fairly liberal" one. *James v. XPO Logistics Freight, Inc.*, No. 19-2390-HLT-ADM, 2020 WL 4569154, at *2 (D. Kan. Aug. 7, 2020). That's so because federal courts prefer to dispose of a case "'upon its merits and not by default judgment.'" *Id.* (quoting *Gomes v. Williams*, 420 F.2d 1364, 1366 (10th Cir. 1970)). The

court thus must strike a balance between the "defendant's interest in adjudicating the case on the merits" and "'the interest of the public and the court in the orderly and timely administration of justice.'" *Id.* (quoting *Kiewel v. Balabanov*, No. 10-2113-JTM, 2011 WL 1770084, at *2 (D. Kan. May 9, 2011)).

To decide whether good cause exists, courts consider a nonexclusive list of factors. *See Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 750 (10th Cir. 2009). The list includes: "'whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented.'" *Id.* (quoting *Dierschke v. O'Cheskey*, 975 F.2d 181, 183 (5th Cir. 1992)). The court addresses these factors, one-by-one, and concludes that XTM has shown good cause to set aside the default.

A.   **Willful Conduct**

First, consider the willful conduct factor. "A defendant's knowledge of a lawsuit and his postservice actions play a role in measuring the willfulness of a defendant's default." *James*, 2020 WL 4569154, at *2 (internal quotation marks and citation omitted). And the "court should consider whether the defendant was trying to stall litigation or was purposefully disregarding the authority of the court." *Perez v. Dhanani*, No. 13-1020-RDR, 2015 WL 437769, at *2 (D. Kan. Feb. 3, 2015). Our court has concluded that "inadvertently set[ting] aside" served papers, such that they aren't subject to the "company's normal practice[,]" counsels against a finding of willfulness. *James*, 2020 WL 4569154, at *3; *see also Fed. Ins. Co. v. TAT Techs.*, No. 16-2755-JWL, 2017 WL 11446208, at *1 (D. Kan. Sept. 28, 2017) (concluding defendant didn't seem "especially culpable" where the proof of service didn't indicate who signed the receipt and "documents were not routed properly to the responsible people"). Willfulness is also unlikely where defendant—upon learning of the suit—swiftly acts to retain counsel and engage in the

proceedings.  *See James*, 2020 WL 4569154, at *3.

Here, the court finds, XTM didn't act willfully in failing to meet its response deadline. As in *James* and *TAT Technologies*, the served documents didn't make it to the responsible people in time.  *See* Doc. 15-1 at 3 (Lester Decl. ¶ 4).  Somehow the papers didn't make it from XTM's registered agent to its legal department.  *See id.* at 4 (Lester Decl. ¶ 8).  And, upon realizing that Kansys Staffing had served XTM, defendants' legal counsel immediately engaged local counsel to represent the company.  *Id.* at 2 (Lester Decl. ¶ 3).  QRails was served earlier, and because Kansys Staffing sued XTM as d/b/a QRails, Inc., "confusion about the party being sued" seems to have led to this absence of notice.  *Id.* at 3 (Lester Decl. ¶¶ 4–5).  Though XTM isn't clear about when it discovered the service issue, they attempted to explain the situation to Kansys Staffing the same day Kansys Staffing submitted a proposed order for entry of default. Doc. 15 at 7; Doc. 15-2 at 2 (Def. Ex. 2).  And they filed this motion a few weeks later.  Doc. 15 at 4–8.

Swift action like this "does not demonstrate purposeful disregard for the court's authority."  *James*, 2020 WL 4569154, at *3; *Cannon v. SFM, LLC*, No. 18-2364-JWL, 2018 WL 5791614, at *2 (D. Kan. Nov. 5, 2018) (finding no willfulness where counsel "promptly reached out to plaintiff's counsel and this court to fix the mistake").  The willfulness factor favors a finding of good cause.

### B. Prejudice

Next, take prejudice to plaintiff Kansys Staffing.  In this context, prejudice refers to "'acts done by the moving party or events that have occurred which have in some way impaired or thwarted the non-moving party's ability to litigate or defend the case.'"  *Kiewel*, 2011 WL 1770084, at *4 (quoting *McCook v. Flex Fin. Holding Co.*, No. 08-2039-CM-GLR, 2008 WL

1924129, at *2 (D. Kan. Apr. 29, 2008)). Defendant makes two arguments why Kansys Staffing wasn't prejudiced. *First*, the short delay here is insufficient to show prejudice. Doc. 15 at 9. And, *second*, the claims against both XTM and QRails involve the same issues, facts, and evidence. *Id.* at 9–10. The court agrees. Kansys Staffing hasn't shown any prejudice and, in all likelihood, wasn't prejudiced.

Tellingly, Kansys Staffing never opposed the motion. *See Thornsbury v. Kansas*, No. 22-2307-JWB, 2023 WL 346051, at *1 (D. Kan. Jan. 20, 2023) (concluding prejudice factor "weighs in favor of setting aside the clerk's entry of default" when plaintiff doesn't oppose the motion). And our court has found good cause where a plaintiff doesn't allege prejudice and the case is in the early stages. *See TAT Technologies*, 2017 WL 11446208, at *2 (finding no prejudice where plaintiff didn't argue prejudice and wouldn't "suffer from the delay in the litigation of its claims"); *McCook*, 2008 WL 1924129, at *2 (finding no prejudice where plaintiff didn't identify any, little discovery was exchanged, and few case deadlines had passed).

Plus, defendant is right. A slight delay isn't prejudicial. Instead, plaintiff "must show that any delay has actually hindered its ability to litigate the case." *James*, 2020 WL 4569154, at *4 (internal quotation marks and citation omitted). Kansys Staffing hasn't alleged it will suffer any prejudice. After all, the delay lasted just a few weeks and the claims against both parties overlap. *See* Doc. 15 at 8 (noting that Motion to Set Aside Clerk's Entry of Default was filed two months after XTM was served and "less than three weeks after the default was entered"); *id.* at 9 (explaining that plaintiff's claims "are pleaded collectively against both defendants without differentiating between them" and otherwise on a derivative liability theory). In sum, the court "can see no reason why Plaintiff would suffer any prejudice from setting aside the entry of default." *King of Freight LLC v. Viva Express, Inc.*, No. 22-1187-EFM-TJJ, 2022 WL

6

17555397, at *2 (D. Kan. Dec. 9, 2022). So, the second factor likewise favors good cause to set aside the entry of default.

### C. Meritorious Defense

The last factor asks whether XTM has a meritorious defense. But like the good cause standard as a whole, "the burden to show a meritorious defense is light." *Kiewel*, 2011 WL 1770084, at *4 (quotation cleaned up). A defendant needn't show "a likelihood of success on the merits." *Crutcher v. Coleman*, 205 F.R.D. 581, 585 (D. Kan. 2001). Instead, a defendant's motion "need only plausibly suggest the existence of facts which, if proven at trial, would constitute a cognizable defense." *Id.*

XTM has discharged its burden here. In response to Kansys Staffing's breach of contract claim, XTM asserts it wasn't a party to the contract, it isn't the same company as QRails, and it never assumed QRails's contractual obligations. Doc. 15 at 11; Doc. 15-1 at 5 (Lester Decl. ¶ 9). And, XTM challenges the foundational facts on which Kansys Staffing's account stated, quantum meruit/unjust enrichment, negligent misrepresentation, and fraudulent misrepresentation claims rely. Doc. 1 at 4–7 (Compl. ¶¶ 26–51). XTM alleges that it "did not direct the provision of services, receive the benefit of the services Plaintiff provided to QRails under the contract, or make the alleged misrepresentations regarding agreement to pay for services provided under the contract." Doc. 15 at 11. Without opining about the merits of these defenses, the court concludes that XTM presents defenses sufficient to satisfy its relatively light burden. *See Adams v. Keystone Props., Inc.*, No. 14-1409-JTM-KGG, 2015 WL 1646407, at *3 (D. Kan. Apr. 14, 2015) (finding "defendant's assertion [meets] the minimal standard" where defendant challenged the facts on which plaintiff's claims turned).

In sum, this situation isn't one where defendant is "essentially unresponsive[.]" *In re*

7

*Rains*, 946 F.2d 731, 732 (10th Cir. 1991) (recognizing that default judgments normally are "available only when the adversary process has been halted because of an essentially unresponsive party"). XTM didn't act willfully. Setting aside the default wouldn't prejudice Kansys Staffing. And XTM has asserted meritorious defenses. The court thus finds XTM has shown good cause, and the court sets aside the Clerk's Entry of Default (Doc. 13).

Next, the court evaluates whether the parties must arbitrate their dispute.

### III.     Motion to Compel Arbitration (Doc. 14)

The parties agree that binding arbitration is proper—at least on the claims asserted against defendant QRails. Defendants argue Kansys Staffing must arbitrate its claims because they rely on a contract concerning a mandatory arbitration provision. Doc. 14 at 1. And plaintiff Kansys Staffing consents to arbitration. Doc. 16 at 2. XTM joined the Motion to Compel in the event the court granted its Motion to Set Aside Entry of Default (Doc. 15). *See* Doc. 14 at 4 n.1. Kansys Staffing never opposed arbitrating its claims against XTM—but it's also true that Kansas Staffing never expressly consented to arbitration. *See generally* Doc. 16. Instead, it simply consented to arbitration "pursuant to the Agreement," without addressing whether that consent extends to claims against XTM. *Id.* at 2. The court views Kansys Staffing's concession to mean that it doesn't oppose arbitration to the claims vis-à-vis QRails. *See Owens v. Trans Union LLC*, No. 16-2382-JWL, 2016 WL 5466387, at *1 (D. Kan. Sept. 29, 2016) (granting motion to compel arbitration as unopposed where plaintiff responded by conceding that claims were arbitrable). But the absence of opposition doesn't necessarily end the analysis. The court still must evaluate the merits of the request for arbitration. This is particularly true as the question applies to XTM since Kansys Staffing's response is silent on that defendant.

The court evaluates the arbitration motion in the following sequence: *first*, it recites the

legal standard for compelling arbitration under the Federal Arbitration Act; *second*, it considers whether there was a binding arbitration clause enforceable by both QRails and XTM; *third*, it evaluates whether the claims fall within the arbitration provision's scope; and *fourth*, it decides whether to stay or dismiss this case pending arbitration.

### A.     Legal Standard

The Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16, deems written arbitration clauses "valid, irrevocable, and enforceable[.]"  9 U.S.C. § 2.  The United States Supreme Court interprets the FAA to establish a strong federal policy favoring arbitration.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983) ("[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration. . . . [A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]").  And the court thus requires "liberal reading of arbitration agreements[.]"  *Id.* at 22 n.27.  To evaluate whether arbitration is required, the court must decide two things:  (1) whether there is an agreement providing the moving party a right to compel arbitration; and (2) whether the allegations in the complaint fall within the arbitration clause's scope.  *Cavlovic v. J.C. Penney Corp.*, 884 F.3d 1051, 1057 (10th Cir. 2018).

### B.     Right to Compel Arbitration

Kansys Staffing and QRails don't dispute that they entered a binding agreement with one another.  *See* Doc. 1 at 2 (Compl. ¶ 7) (referencing the staffing agreement between Kansys Staffing and QRails); Doc. 14 at 2 (QRails's Motion to Compel) ("There can be no doubt the parties have an enforceable agreement that includes an arbitration provision[.]").  And both Kansys Staffing and QRails agree that Kansys Staffing attached a true and accurate copy of their agreement to the Complaint.  Doc. 14 at 2; Doc. 1 at 2 (Compl. ¶ 7).  These agreed facts provide

the requisite foundation for the following two-part analysis.

### 1. QRails's Right to Compel

Both parties agree. The arbitration clause requires binding arbitration of Kansys Staffing's claims against QRails. *See* Doc. 14 at 5 (QRails's Motion to Compel) ("Plaintiff's claims against both Defendants all fall squarely within the scope of the aributation provision included in the agreement[.]"); Doc. 16 at 1–2 (Kansys Staffing's Response) (emphasizing that XTM is in default and liable to Kansys and that "Kansys consents to binding arbitration, pursuant to the Agreement, as to the claims asserted in [the Complaint]"). So, there's an enforceable arbitration clause—at least as enforced by QRails, a party who signed the contract.

### 2. XTM's Right to Compel

The plot thickens a bit for XTM, though. XTM didn't sign the contract containing the arbitration clause. *See generally* Doc. 1-1 (Pl. Ex. A); *see also* Doc. 15 at 1 (XTM, Inc.'s Motion to Set Aside Default) ("XTM is not a party to that contract[.]"); Doc. 14 at 4 ("The intertwined nature of the claims against QRails and XTM permits XTM to enforce the arbitration provision even though it is not a party to the contract."). And, XTM argues, XTM isn't the same corporation as QRails—legally, operationally, contractually, or otherwise. *See* Doc. 15 at 1. XTM claims that it isn't a beneficiary of the contract, either. *See id.* at 11 ("XTM did not . . . receive the benefit of the services Plaintiff provided to QRails under the contract[.]"). But XTM nonetheless seeks to enforce the arbitration clause for claims asserted against it to the extent they are intertwined with arbitrable claims against QRails.[3] *See* Doc. 14 at 4–5. The court briefly addresses XTM's argument, answering this question: When can a party who didn't sign

---

[3] Recall that Kansys Staffing's Response didn't address explicitly whether it opposes arbitration of claims asserted against XTM. It only explains that XTM "is"—now was—in default. Doc. 16 at 1–2. So, Kansys Staffing didn't respond to defendants' argument that XTM could enforce the arbitration clause for claims against it.

the contract enforce an arbitration clause against a party to the contract?

The answer turns on state contract law.[4] *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). As one would expect, a court typically can't order a party to arbitrate a dispute they haven't agreed to arbitrate. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 707–08 (10th Cir. 2011) (citing *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). But relying on an estoppel theory, XTM asserts that it too may enforce the arbitration agreement. Doc. 14 at 4–5. Essentially, XTM argues, Kansys Staffing is estopped from preventing enforcement of the arbitration clause as it applies to XTM. *Id.* at 5. That's so because Kansys Staffing's claims theorize connected misconduct by both QRails (an express party to the contract containing the arbitration clause) and XTM, a nonparty. *Id.* The court's "task in these circumstances is to determine whether the [Kansas] high court would permit the nonsignatory to enforce the arbitration clause." *Reeves v. Enterprise Prods. Partners, LP*, 17 F.4th 1008, 1012 (10th Cir. 2021). And if the state's high court hasn't decided the issue, "the district court must 'attempt to predict what the state's highest court would do.'" *Id.* (quoting *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007)).

The Kansas Supreme Court hasn't weighed in on the estoppel enforcement theory, as

---

[4]   Here, the contract between Kansys Staffing and QRails contains a Kansas choice of law provision. Doc. 1–1 at 6 (Pl. Ex. A). So, Kansas law governs questions about the arbitration clause's enforceability. *See Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 375 (Kan. 2002) (explaining in choice of law analysis that when an agreement contains a choice of law clause, "Kansas courts generally effectuate the law chosen by the parties to control the agreement"); *cf. Cavlovic*, 884 F.3d at 1057 (applying Utah law to decide whether nonparty could enforce arbitration clause because the contract had a Utah choice of law clause).

Because XTM isn't a party to the contract, it's unclear whether it consented to the use of Kansas law. But Kansas choice-of-law principles direct the court here to apply Kansas law regardless. *See Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 982 (10th Cir. 2014) (recognizing the court must apply Kansas choice-of-law principles and where "a party fails to make 'a clear showing that another state's law should apply,' Kansas choice of law principles require a court to default to Kansas substantive law" (quoting *In re K.M.H.*, 169 P.3d 1025, 1032 (Kan. 2007)). XTM hasn't suggested a different state's law applies, so the court defaults to Kansas law.

applied to nonsigners of arbitration clauses. In this circumstance, our court may "seek guidance" from decisions of lower state courts, states "with similar legal principles," and federal district courts interpreting Kansas law. *Id.* Ultimately, "the general weight and trend of authority in the relevant area of law" should illuminate the likeliest outcome by the state's highest court. *Id.* (quotation cleaned up). For the reasons that follow, the court predicts the Kansas Supreme Court would adopt and apply an equitable estoppel theory to this case's context.

The court's analysis begins with a decision by the intermediate court of appeals in the state, the Kansas Court of Appeals. In *Hemphill v. Ford Motor Company*, the court of appeals adopted this principle: "equitable estoppel should be applied when the signatory to the contract containing the arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." 206 P.3d 1, 9 (Kan. Ct. App. 2009) (quotation cleaned up) (collecting cases from seven federal circuits).[5] *Id.*

In *Hemphill*, plaintiffs sued three defendants on various theories arising from a vehicle

---

[5] The Kansas Court of Appeals isn't alone. Many other states recognize a similar estoppel theory when deciding whether nonsignatories may enforce arbitration clauses. *See, e.g.*, *Reeves*, 17 F.4th at 1012–13 (collecting cases and concluding Oklahoma's high court would adopt an estoppel theory in this context); *S. Energy Homes, Inc. v. Kennedy*, 774 So.2d 540, 545 (Ala. 2000) (recognizing that "a nonsignatory can compel arbitration of claims against it if those claims are sufficiently intertwined with claims against a signatory to the agreement containing the arbitration clause"); *Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305–08 (Tex. 2006) (applying estoppel theory to nonsignatory's enforcement of arbitration provision); *Melendez v. Horning*, 908 N.W.2d 115, 119–20 (N.D. 2018) (same); *RUAG Ammotec GmbH v. Archon Firearms, Inc.*, 538 P.3d 428, 435 (Nev. 2023) (adopting equitable estoppel theory and extending it to nonsignatory seeking to compel arbitration against another nonsignatory).

But as our Circuit has recognized, some courts decline to apply equitable estoppel in this context. *See Reeves*, 17 F.4th at 1012–13 (first citing *Doe v. Carmel Operator, L.L.C.*, 160 N.E.3d 518 (Ind. 2021); then citing *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009); and then citing *Ervin v. Nokia, Inc.*, 812 N.E.2d 534, 542–43 (Ill. 2004)).

Evaluating the weight of authority, the court predicts the Kansas Supreme Court likely would adopt *Hemphill*'s approach. That is, the court predicts the Kansas Supreme Court would apply the equitable estoppel theory to decide whether a nonsignatory may compel arbitration against a signatory.

purchase gone wrong. *Id.* at 5. The Hemphills had signed a financing contract with Fenton Motors, who later assigned it to Chrysler Financial. *Id.* The financing contract included an arbitration provision. *Id.* And the Kansas Court of Appeals held that both Chrysler Financial and Fenton Motors could enforce the arbitration clause. *Id.* at 7. But the third defendant—Ford Motor Company—wasn't a party to that agreement. *Id.* at 8. And it wasn't covered by the agreement's express terms. *Id.* So, the court of appeals noted, "the Hemphills did not agree to arbitrate claims against Ford by entering into the financing agreement." *Id.* at 9. But, there was another way for Ford to force the Hemphills to arbitrate their claims against the company: the estoppel theory. *Id.*

Under this theory, a nonsignatory may enforce an arbitration clause where the signatory plaintiff alleges "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Id.* (internal quotation marks and citation omitted). The court of appeals concluded that the Hemphills' claims all arose from an allegedly malfunctioning vehicle and defendants' allegedly joint conduct to avoid fixing the car. *Id.* at 10. Ultimately, the court reasoned, it would prove "senseless to have parallel arbitration and court proceedings devoted to determining" similar issues. *Id.* So, it ruled, "[t]he Hemphills' claims against Ford [were] so closely connected to their claims against Fenton Motors and Chrysler Financial that the Hemphills are estopped from refusing Ford's attempt to compel arbitration." *Id.* at 9. As the court already noted in footnote 5, the Kansas appellate court's take on this theory tracks one used by other states.

The estoppel standard, as the Kansas Court of Appeals puts it, "boils down to how close a connection exists between the claims explicitly subject to arbitration and those involving the party that didn't sign the arbitration agreement." *Id.* The asserted misconduct must be

13

"substantially interdependent[.]" *Id.* And here, Kansys Staffing's claims against XTM are "substantially interdependent" with their claims against QRails. As defendants emphasize, Kansys Staffing's claims "are predicated on the theory that XTM assumed obligations for payment under the contract by agreeing to pay outstanding sums and by benefitting from services provided under that agreement." Doc. 14 at 4. Kansys Staffing doesn't dispute this characterization of its claim against XTM. *See generally* Doc. 16 (mentioning XTM only once to explain that it was in default and functionally had admitted all of plaintiff's allegations). What's more, the Complaint emphasizes that XTM "promised to pay the outstanding debt on behalf of XTM and QRails." Doc. 1 at 3 (Compl. ¶ 17). And Kansys Staffing refers generally to "defendants" in many of its causes of action. *See id.* at 4–7 (Compl. ¶¶ 20–50). The court is satisfied that the claims asserted here are substantially interdependent and sufficient to apply equitable estoppel here. XTM thus can enforce the arbitration clause against Kansys Staffing.

Next, on to the second question governing a party's right to compel arbitration: what claims does the arbitration clause encompass?

### C. Scope of Arbitration Clause

Where arbitration language is "broad[,]" a presumption in favor of arbitrability arises. *Cavlovic*, 884 F.3d at 1059. The arbitration clause here is broad. It encompasses "any dispute" between the parties "arising out of this Agreement and the services" provided through it. Doc. 1-1 at 6 (Pl. Ex. A); *Chelsea Fam. Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1199 (10th Cir. 2009) (concluding "arising out of or relating to" language is broad (emphasis omitted)); *Cavlovic*, 884 F.3d at 1059 (same). Kansys Staffing asserts five causes of action: breach of contract, account stated, quantum meruit/unjust enrichment, negligent misrepresentation, and fraudulent misrepresentation. *See* Doc. 1 at 3–7 (Compl. ¶¶ 18–51). And

14

defendants persuasively argue each claim falls within this arbitration language, *i.e.*, encompassing "any dispute[.]" *See* Doc. 14 at 3–4. Kansys Staffing doesn't must any reason supporting a contrary decision. *See* Doc. 16 at 2. So, considering the motion's unopposed nature, the facts alleged in the Complaint, and the presumption of arbitrability, the court concludes all claims fall comfortably within the scope of the arbitration clause.

Next, and last: should the court stay or dismiss the case?

### D. Stay or Dismiss

The stay or go away question is tricky in other contexts. Not here. The FAA provides that once the court is "satisfied" that the issues are arbitrable and one of the parties has asked for a stay, the court must stay the action. 9 U.S.C. § 3; *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."). In short, the court has no discretion to dismiss it. *Smith*, 601 U.S. at 475–76. Although defendants first requested dismissal, they acknowledge that the court should stay the case if Kansys Staffing requests it. *See* Doc. 14 at 6 n.2. And Kansys Staffing has so requested. *See* Doc. 16 at 2. So, the court stays this case pending arbitration.

## IV. Conclusion

Kansys Staffing never opposed XTM's Motion to Set Aside Default (Doc. 15). Having evaluated XTM's arguments, the court finds good cause to set aside the Clerk's Entry of Default (Doc. 13). So it does so, granting XTM's motion and vacating the entry of default.

When a party expressly consents to an opponent's motion, the court takes the party at its word. Here, the parties all consented to arbitration of these claims—at least against QRails. Kansys Staffing never addressed whether its claims against XTM were arbitrable if the court set

15

aside the default. But the court is satisfied that arbitration is required under the contract's arbitration clause, the FAA, and Kansas contract law. The court grants the Motion to Compel Arbitration (Doc. 14).[6]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant XTM, Inc.'s Motion to Set Aside Entry of Default (Doc. 15) is granted. The Clerk's Entry of Default (Doc. 13) is vacated.

**IT IS FURTHER ORDERED THAT** defendants' Motion to Compel Arbitration and Dismiss Action Without Prejudice (Doc. 14) is granted in part and denied in part. The court grants the motion to compel arbitration but denies the motion to dismiss the action.

**IT IS FURTHER ORDERED THAT** this matter is stayed pending arbitration. Defendants shall file a status report on the progress of the arbitration within 180 days of this Order, or upon completion of the arbitration proceeding, whichever occurs first.

**IT IS SO ORDERED.**

**Dated this 27th day of January, 2025, at Kansas City, Kansas.**

                                                                **s/ Daniel D. Crabtree**
                                                                **Daniel D. Crabtree**
                                                                **United States District Judge**

---

[6] Defendants first asked the court to dismiss the case pending arbitration, and alternatively asked the court to stay the case. *See* Doc. 14 at 7. To the extent defendants requested dismissal, the court denies that aspect of their motion.